```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  3/29/2017
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------- X
                                                        :
BRIDGETTE L. BURCH,                                     :
                                                        :
                              Plaintiff,                :
                                                        :
               -v-                                      :          1:15-cv-9350-GHW
                                                        :
COMMISSIONER OF SOCIAL SECURITY,                        :          MEMORANDUM OPINION AND
                                                        :                    ORDER
                              Defendant.                :
                                                        :
-------------------------------------------------------- X

GREGORY H. WOODS, United States District Judge:

        Plaintiff Bridgette L. Burch brings this action *pro se* pursuant to 42 U.S.C. § 405(g), seeking

review of the final decision of the Commissioner of Social Security (the "Commissioner") denying

her claim for disability insurance benefits ("DIB") under Title II of the Social Security Act (the

"Act").  The Commissioner has moved for judgment on the pleadings pursuant to Rule 12(c) of the

Federal Rules of Civil Procedure.  For the reasons stated below, the Commissioner's motion is

GRANTED.

## I.       BACKGROUND[1]

### A.  Ms. Burch's Claim for Benefits and Procedural History

        Ms. Burch applied for disability insurance benefits on October 17, 2011, alleging that she

had become disabled on August 7, 2010.  Tr. 206-07.  In response to a DIB application question

that asked her to list all of the physical or mental conditions that "limit [her] ability to work," Ms.

Burch listed:  ulcerative colitis, endometriosis, fibroids, scoliosis, Crohn's Disease, chronic fevers,

bleeding and pain, infertility, beta thalassemia minor, dizziness, shortness of breath, hemivertebrae,

facet joint disease, arthritis, a herniated disc, vertebrae fusion in neck and back, depression, anxiety,

---

[1] The Court's summary of the facts of this case is drawn from the administrative record ("Tr.").  Dkt. No. 9.

chronic fatigue syndrome, blurred vision, night blindness, light sensitivity, chronic pain in nerves and joints, and ringing in ears. Tr. 231. Her application was denied initially on December 21, 2011 and at the reconsideration level on December 10, 2012. Tr. 121-22, 145-46. Ms. Burch requested a hearing before an administrative law judge ("ALJ"). Tr. 147-48. After a hearing on March 6, 2014, ALJ Michael A. Krasnow issued a decision on May 7, 2014 finding that Ms. Burch was not disabled during the period between her amended alleged onset date of September 25, 2011 and December 31, 2011 (her "date last insured" or "DLI"). Tr. 12-22. The ALJ's decision became the final decision of the Commissioner when, on September 23, 2015, the Appeals Council denied Ms. Burch's request for review. Tr. 1-6.

On November 25, 2015, Ms. Burch filed this *pro se* action seeking review of the ALJ's decision pursuant to Section 205(g) of the Act, 42 U.S.C. § 405(g). On June 8, 2016, the Commissioner moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). ECF No. 19, Notice of Mot.; ECF No. 20, Mem. of Law in Supp. of Mot. for J. on the Pleadings ("Comm'r Mem."). Ms. Burch filed a memorandum of law in opposition to the Commissioner's motion on July 5, 2016. ECF No. 21, Mem. of Law in Opp'n to Mot. for J. on the Pleadings ("Pl.'s Mem."). The Commissioner filed a reply memorandum of law on July 19, 2016. ECF No. 22, Reply Mem. of Law in Supp. of Mot. for J. on the Pleadings ("Comm'r Reply Mem.").

### B.  The Administrative Record Before the ALJ

The Commissioner has provided a summary of the medical and non-medical evidence in the administrative record. *See* Comm'r Mem. at 2-16. Ms. Burch has not contested the Commissioner's summary of this evidence, nor has she provided her own summary. Having thoroughly examined the administrative record, the Court incorporates by reference the Commissioner's summary.

### C.  The March 6, 2014 Hearing

Ms. Burch was represented by attorney Jonathan R. Bromberg at her hearing before the ALJ

on March 6, 2014. Tr. 31.[2]  In an opening statement, Mr. Bromberg argued that Ms. Burch's

condition satisfied Listing 5.06 because she had bowel blockages, a diagnosis of ulcerative colitis,

and was hospitalized twice more than 60 days apart. Tr. 33.  Mr. Bromberg also stated that, "given

the frequency of her need to toilet herself and everything, there's—it's virtually impossible for her to

engage in any substantially gainful activity on a consistent basis." *Id.*  Mr. Bromberg raised no

objections to the admission of the record into evidence. Tr. 32.  He also stated that he had

discussed with Ms. Burch the issue of her date last insured ("DLI"), and that it was December 31,

2011. Tr. 34.  Mr. Bromberg also moved to amend Ms. Burch's alleged disability onset date from

August 7, 2010 to September 25, 2011, the date on which Ms. Burch had had a colonoscopy that

Mr. Bromberg argued "[fell] squarely within the confines of 5.06." Tr. 73.  Ms. Burch explained to

the ALJ that Mr. Bromberg had discussed with her the ramifications of amending her onset date, as

had her husband. Tr. 73-74.[3]

      Ms. Burch testified that she was born in 1974, making her 40 years old at the time of the

hearing. Tr. 37.  She obtained a bachelor's degree in August 2013. Tr. 39, 43-44.  Ms. Burch stated

that she had not worked for pay or on a volunteer basis since August 2010. Tr. 48-49.  Her most

recent employment was at Southwest Reef Company, a saltwater aquarium store owned by her

brother. Tr. 44-47.  She worked there from March 2009 until August 2010, and her duties included

opening and closing the store, helping customers with bagging items, opening deliveries, counting

and stocking items, and talking to customers. Tr. 45.  According to her testimony, Ms. Burch

stopped working at Southwest Reef Company because she could not physically carry and bag large

items, such as rocks and sand, that customers needed to set up their fish tanks, and she was having

---

[2] Mr. Bromberg's name is misspelled in the hearing transcript, where he is referenced as "Mr. Romberg."  His full name appears frequently in other portions of the administrative record. *See, e.g.*, Tr. 158 (SSA Appointment of Representative form).

[3] Because Ms. Burch amended her alleged onset date to September 25, 2011, the relevant period for establishing her eligibility for DIB became September 25, 2011 through December 31, 2011.

trouble counting the drawer and performing other closing duties.  Tr. 46.  She testified that she was "constantly in the bathroom all the time and when deliveries and stuff would come in, people were getting frustrated that [she] wasn't upfront where [she] needed to be" and that she did not feel that she could physically perform the work that was expected of her.  Tr. 46-47.  Since leaving that job, Ms. Burch had attempted unsuccessfully to find a part time job that she could do for a couple of hours each week from home.  Tr. 48-49.  Prior to her job at Southwest Reef Company, Ms. Burch worked as a senior licensing coordinator at an investment bank, where she helped sales people obtain licenses.  Tr. 46.  She also worked for the compliance department at the same bank.  *Id.*

With respect to her alleged disability, Ms. Burch testified that a Dr. Farrer diagnosed her with irritable bowel syndrome ("IBS") in September 2011 after performing a "scope."  Tr. 50.  Ms. Burch started taking medications for IBS that month, but they did not help; in fact, some of them made her sicker.  Tr. 51-52.  She testified that they made her bleeding worse, caused pain in her jaw and other parts of her body, caused tingling in her hands and feet, and increased her fatigue.  *Id.*  She had also gained 20 pounds over the preceding few months due to the medications.  Tr. 37.

Ms. Burch stated that, during the period between August 2010 and the end of 2011, she used the restroom between 20 and 30 times each day.  Tr. 52-53.  During that same period, she had lost more than 25 pounds due to diarrhea and illness.  Tr. 37.  The ALJ asked Ms. Burch when she started using the restroom with such frequency, to which she responded:  "Late 2009, I wasn't feeling right at all.  2010, it was starting to increase significantly, like really, really bad.  By the time 2011 came, I was a wreck."  Tr. 52-53.  Her bleeding used to come and go every couple of weeks but increased until it occurred daily every time Ms. Burch went to the bathroom, even when she urinated.  Tr. 53.  Ms. Burch testified that she had an accident at a grocery store in early 2011, and at another store at some time thereafter.  Tr. 55.  She also had some accidents while in the car with her husband.  *Id.*  Although she tried wearing special undergarments, they caused frequent urinary tract

infections.  *Id.*  Also in an effort to address her symptoms, she started taking special supplements and was prescribed a mostly liquid diet with no fiber.  Tr. 56.  According to Ms. Burch's testimony, her symptoms worsened after 2011, and in 2012, another doctor (Dr. Carmen, who she began seeing in May 2012) determined that Ms. Burch was allergic to one of the medications she had been taking. Tr. 56-57.

The ALJ also asked Ms. Burch several questions about her lifestyle and daily activities during the period between August 2010 and the end of 2011.  Ms. Burch testified that she lived with her husband and two cats in a first-floor apartment.  Tr. 38.  Although she had a driver's license, she stopped driving during the summer of 2010 because she was having blackouts and problems with her vision, which she was told were related to her colon disease.  Tr. 38-39.  During 2011, she took online law courses through Pennsylvania State University for a "couple of hours" on a "couple of days a week."  Tr. 39-42.  During the hearing, Ms. Burch was unable to recall exactly when she had withdrawn from the Penn State program, though she testified that she thought she had tried to withdraw at some point during the Fall 2011 semester.  Tr. 41-42.[4]  In response to Ms. Burch's difficulty recalling the exact dates, the ALJ asked Mr. Bromberg to obtain and submit her educational records to establish precisely when she was and was not in school.  Tr. 44.

Ms. Burch testified that she was able to shower and get dressed on her own, but had to do so while sitting on a stool due to dizzy spells.  Tr. 57-58.  Her husband cooked, cleaned their apartment, did their laundry, and took care of their cats.  Tr. 58.  He also did most of the grocery shopping, though Ms. Burch occasionally went with him to the store, which was just a couple of blocks down the street.  *Id.*  Ms. Burch stated that she spent a lot of her time in the bathroom, and that when she was not in the bathroom, she rested and read about her illness, in addition to taking

---

[4] A record from Pennsylvania State University that was submitted in connection with Ms. Burch's initial application for benefits shows that she withdrew at some point during the Spring 2012 semester.  Tr. 317.

her online classes. Tr. 58-59. She also occasionally read books and magazines. Tr. 61. She testified

that she did not take any trips or vacations outside the state and could not attend a movie or go

anywhere without having access to a bathroom. Tr. 60. She also testified that she did not exercise

regularly, aside from stretches on the floor, light walking to and from the car, and occasional five-

minute walks around the property on which she lived. Tr. 61, 63. When the ALJ asked Ms. Burch

about a doctor's notation dated December 2011 stating that she rode a bicycle three days each week

for an hour each time, she stated that the note was incorrect, and that she had only ridden the

bicycle before the summer of 2011, when her bleeding became a problem. Tr. 61-62. The ALJ also

advised Ms. Burch that the same doctor's note from December 2011 stated that she walked for

about 30 minutes every day. Tr. 63-64. As with the bicycling, Ms. Burch responded that she had

stopped that routine in the summer of 2011, before her "constant chronic bleeding." *Id.*

According to her testimony, Ms. Burch and her husband socialized with his work friends

occasionally, but mainly with her brother and her brother's family. Tr. 64. They would go to her

brother's house, which was about 20 minutes away, to eat and watch movies. Tr. 65. While there,

her brother would clear one of their bathrooms for Ms. Burch and tell everyone else to use a

different bathroom so that she could have privacy. Tr. 65. Ms. Burch testified that she and her

husband did not attend church or other religious services during the relevant period, nor did they

attend sporting events, concerts, or shows. Tr. 65.

The ALJ then examined Dr. James Ryan, a vocational expert. First, the ALJ asked Dr. Ryan

to classify Ms. Burch's past work. Tr. 67. Dr. Ryan testified that, for her work at Southwest Reef

Company, where she had cashier and stocking duties, "the DOT is 290.477-014, light exertional

level, semi skilled, SVP 3," with no transferability of skills. Tr. 67.[5] For her position at the

---

[5] "DOT" refers to the Department of Labor's Dictionary of Occupational Titles, which the Social Security
Administration uses to classify the demands of particular jobs as sedentary, light, medium, heavy, or very heavy. 20
C.F.R. § 404.1157. "SVP" refers to "Specific Vocational Preparation," which is "the amount of lapsed time required by

investment bank, Dr. Ryan testified that "the DOT is 186.117-090," and that it was sedentary and skilled, with an SVP of 8. *Id.* He also testified that "[t]here are many and varied transferable skills from this position, although it is already at the sedentary level as classified." Tr. 68.

The ALJ then asked Dr. Ryan to assume a hypothetical individual with the same age, education, and past jobs as Ms. Burch, with the following residual functional capacity: the person is "capable of the full range of light work, except can occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl, never climb ropes, ladders, or scaffolds." *Id.* The ALJ added that this hypothetical person "must have regular access to the restroom, which is defined as the restroom being on the same floor as the work station." *Id.* The ALJ asked Dr. Ryan whether that hypothetical person would be able to perform any of Ms. Burch's past work. *Id.* Dr. Ryan testified that such a person could perform all of Ms. Burch's past work. *Id.*

The ALJ then asked Dr. Ryan whether Ms. Burch's past work would still be available if the hypothetical person was limited to no more than occasional contact with the general public or with co-workers. *Id.* Dr. Ryan testified that it would not, but that there are other jobs that a person with that added limitation could perform. Tr. 69. Specifically, he testified that such an individual could perform the following unskilled, light jobs: finish inspector, DOT 741.681.010 (48,000 jobs nationwide); cable worker, DOT 788.687.142 (45,000 jobs nationwide); and packer and packaging worker, DOT 920.685-026 (51,000 jobs nationwide). *Id.* Dr. Ryan also testified that, keeping all of the limitations the same, including the limitation on interactions with the public and co-workers, but reducing the exertion level down to sedentary, an individual could perform the following jobs: finish machine tender, DOT 739.685-054 (38,000 jobs nationwide); quality control worker, DOT 737.687-026 (46,000 jobs nationwide); and grading and sorting worker, DOT 521.687-086 (36,000

---

a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." 29 C.F.R. 656.3. An SVP of 3 requires "[o]ver 30 days up to and including 3 months." *Id.* An SVP of 8 requires "[o]ver 4 years up to and including 10 years." *Id.*

jobs nationwide).  Tr. 69-70.

Dr. Ryan testified that all six of the jobs he had identified would allow for a sit/stand option at will, but that the introduction of that additional limitation would decrease the numbers by 10 percent.  Tr. 70.  With respect to breaks and absences, he testified that the customary tolerance in the United states is one 15-minute break halfway through the first half of the work session, a 30-60-minute break for lunch, and a second 15-minute break during the second half of the work session. Tr. 70.  Finally, Dr. Ryan testified that, if an individual required more breaks and was off task during 20% or more of the work day, she would "not be employable." Tr. 71.  He also testified, in response to a question from Mr. Bromberg, that if an individual were away from the work task for seven or eight breaks per day, each of five to ten minutes duration, an individual with Ms. Burch's work history would not be employable.  Tr. 72.

### D.  The ALJ's Decision

After finding that Ms. Burch's DLI was December 31, 2011, the ALJ evaluated Ms. Burch's claims according to the five-step sequential evaluation process and concluded that Ms. Burch was not under a disability within the meaning of the Act during the period between her alleged onset date of September 25, 2011 and her DLI of December 31, 2011 (the "Relevant Period").  At step one, the ALJ found that Ms. Burch did not engage in substantial gainful activity ("SGA") during the Relevant Period.  Tr. 14.  At step two, he determined that Ms. Burch had the following severe impairments during the Relevant Period:  irritable bowel syndrome and degenerative disc disease.  Tr. 14-16.  He determined that Ms. Burch's medically determinable mental impairments were not severe, because they did not cause more than minimal limitation in her ability to perform basic mental work activities.  Tr. 14.  The ALJ determined at step three that none of Ms. Burch's impairments, nor any combination of those impairments, was of a severity to meet or medically equal one of the listed impairments in Appendix 1 of the regulations.  Tr. 16-17.

The ALJ then determined that Ms. Burch had the residual functional capacity to perform "light work" as defined in the regulations, except that she could only occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl, and could never climb ropes, ladders, and scaffolds.  Tr. 17-20.  The ALJ also added to her residual functional capacity that she required regular access to a restroom, defined as the restroom being on the same floor of the workstation.  *Id.*  In making this finding, the ALJ considered Ms. Burch's symptoms, objective medical evidence and other evidence, as well as opinion evidence.  *Id.*  The ALJ concluded that, although Ms. Burch's medically determinable impairments could reasonably be expected to cause her alleged symptoms, her "statements concerning the intensity, persistence and limiting effects of [her] symptoms [were] not entirely credible."  Tr. 19.  He also noted that he had accorded the opinion of treating physician Dr. Jessica Norman no weight, because she had begun treating Ms. Burch approximately 15 months after her DLI, which was "too remote to be relevant."  Tr. 20.  The ALJ also noted that "no treating or examining physician endorsed [Ms. Burch's] disability" during the Relevant Period.  *Id.*

At step four, considering Ms. Burch's "age, education, work experience, and residual functional capacity," the ALJ found that Ms. Burch was "capable of performing past relevant work as a fish store cashier/stocking clerk and/or compliance officer" as generally performed.  Tr. 20-21.  The ALJ relied on the testimony of a vocational expert.  Tr. 21.

Although the ALJ had found that Ms. Burch was not disabled at step 4, he made an alternative finding at step 5 that, "considering Ms. Burch's age, education, work experience, and residual functional capacity, there were other jobs that existed in significant numbers in the national economy that [she] also could have performed."  Tr. 21.  Because Ms. Burch had additional limitations that impeded her capacity to perform the full range of "light work," the ALJ could not rely on the Medical-Vocational Guidelines.  Instead, he relied on the testimony of the vocational

expert.  Tr. 21-22.  The vocational expert identified three jobs that existed in the national economy for someone of Ms. Burch's age, education, work experience, and residual functional capacity.  Tr. 22.  The vocational expert also identified three jobs that existed in the national economy for someone of Ms. Burch's age, education, and work experience, but with a residual functional capacity that only permitted sedentary work.  *Id.*  The ALJ determined that the vocational expert's testimony was consistent with the information contained in the DOT.  *Id.*

## II.     APPLICABLE LEGAL STANDARDS

### A.  Standard of Review

A motion for judgment on the pleadings should be granted if it is clear from the pleadings that "the moving party is entitled to judgment as a matter of law."  *Burns Int'l Sec. Servs., Inc. v. Int'l Union*, 47 F.3d 14, 16 (2d Cir. 1995).  In reviewing a decision of the Commissioner, a court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).  The ALJ's disability determination may be set aside only if it is based on legal error or is not supported by substantial evidence.  *See Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999).  "Substantial evidence is 'more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  As the Second Circuit has observed, it is "a very deferential standard of review—even more so than the 'clearly erroneous' standard."  *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (citing *Dickinson v. Zurko*, 527 U.S. 150, 153 (1999)).

If the findings of the Commissioner as to any fact are supported by substantial evidence, those findings are conclusive.  *Diaz v. Shalala*, 59 F.3d 307, 312 (2d Cir. 1995).  "[O]nce an ALJ finds facts, [the reviewing court] can reject those facts only if a reasonable factfinder would have to

conclude otherwise." *Brault*, 683 F.3d at 448 (internal quotations marks and emphasis omitted).  The court must not make a *de novo* determination of disability.  *See Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 1995).  In addition, it is the function of the Commissioner, not the reviewing court "to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant." *Aponte v. Sec'y, Dep't of Health & Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984) (citation omitted); *see also Gernavage v. Shalala*, 882 F. Supp. 1413, 1419 n.6 (S.D.N.Y. 1995) ("Deference should be accorded the ALJ's [credibility] determination because he heard plaintiff's testimony and observed his demeanor (citations omitted)).  Thus, the ALJ, "after weighing objective medical evidence, the claimant's demeanor, and other indicia of credibility . . . may decide to discredit the claimant's subjective estimation of the degree of impairment." *Tejada v. Apfel*, 167 F.3d 770, 776 (2d Cir. 1999). An ALJ's decision on credibility "must contain specific reasons for the finding on credibility, supported by evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Clarke v. Colvin*, No. 15-cv-354 (KBF), 2017 WL 414489, at *6 (S.D.N.Y. Jan. 31, 2017) (citing Social Security Ruling 96-7p).

*Pro se* litigants "are entitled to a liberal construction of their pleadings," and, therefore, their complaints "should be read to raise the strongest arguments that they suggest." *Green v. United States*, 260 F.3d 78, 83 (2d Cir. 2001) (citation and internal quotation marks omitted); *see also Alvarez v. Barnhart*, No. 03-cv-8471 (RWS), 2005 WL 78591, at *1 (S.D.N.Y. Jan. 12, 2005) (articulating liberal *pro se* standard in reviewing denial of disability benefits).

### B.  The Definition of Disability

To gain entitlement to disability insurance, a claimant must show that she is disabled within the meaning of the Social Security Act.  "Establishing the mere presence of a disease or impairment is not sufficient for a finding of disability under the Act; the disease or impairment must result in

severe functional limitations that prevent the claimant from engaging in any substantial gainful activity." *Marrero v. Apfel*, 87 F. Supp. 2d 340, 346 (S.D.N.Y. 2000) (citing 42 U.S.C. § 423(d)(2)(A) and *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999)).  A claimant is disabled under the Act if she demonstrates an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  A determinable physical or mental impairment is defined as one that "results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § 423(d)(3).  A claimant will be determined to be disabled only if the impairments are "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

The Social Security Administration has established a five-step sequential evaluation process for making disability determinations.  *See* 20 C.F.R. § 416.920(a)(4).  The steps are followed in order. If it is determined that the claimant is not disabled at a step of the evaluation process, the evaluation will not progress to the next step.  The Second Circuit has described the process as follows:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity.  Where the Claimant is not, the Commissioner next considers whether the claimant has a "severe impairment" that significantly limits her physical or mental ability to do basic work activities.  If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment that is listed in 20 C.F.R. pt. 404, subpt. P, app. 1.  If the claimant has a listed impairment, the Commissioner will consider the claimant disabled without considering vocational factors such as age, education, and work experience; the Commissioner presumes that a claimant who is afflicted with a listed impairment is unable to perform substantial gainful activity.  Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, she has the residual functional capacity to perform her past work.  Finally, if the claimant is unable to perform her past work, the burden then shifts to the Commissioner to determine

12

whether there is other work which the claimant could perform.

*Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1999); 20 C.F.R. §§ 404.1520, 416.920.  The claimant bears the burden of proof as to the first four steps.  *Melville v. Apfel*, 198 F.3d 45, 51 (2d Cir. 1999).  If the claimant proves that she cannot return to prior work, then the burden shifts to the Commissioner to show, at step five, that other work exists in the national and local economies that the claimant can perform, given her residual functional capacity, age, education, and past relevant work experience. 20 C.F.R. § 404.1560(c)(2); *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998).

The Social Security regulations set out a "special technique" for evaluation of mental impairments.  Calling it a "complex and highly individualized process," the regulations focus the ALJ's inquiry on determining how the impairment "interferes with [the claimant's] ability to function independently, appropriately, effectively, and on a sustained basis."  20 C.F.R. § 416.920a(c)(1), (2). The main areas that are assessed are activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation; each is rated on a five-point scale.  20 C.F.R. § 416.90a(c)(3)-(4).  If an impairment is given the rating of "severe," then the ALJ is instructed to determine whether the impairment qualifies as a listed mental disorder.  20 C.F.R. § 416.920a(d)(2).

In determining whether a claimant is "disabled," the Commissioner must consider "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience."  *Brown v. Apfel*, 174 F.3d 59, 62 (2d Cir. 1999) (per curiam).

## C.  The "Insured Status" Requirement

A person applying for DIB or a period of disability must also satisfy the "insured status" requirements of the Act.  42 U.S.C. § 423(a), (c).  In order to be entitled to benefits, a claimant must establish that her condition or conditions reached disabling severity on or before the expiration of her insured status, *i.e.*, her "date last insured."  *Arnone v. Bowen*, 882 F.2d 34, 37-38 (2d Cir. 1989)

(citing 42 U.S.C. § 423(a)(1)(A)); *see also* 20 C.F.R. § 404.130; 20 C.F.R. § 404.131; 20 C.F.R. 404.315(a); 20 C.F.R. § 404.320(b).

### D.  The Treating Physician Rule

The "treating physician rule" is a series of regulations set forth by the Commissioner in 20 C.F.R. § 404.1527 detailing the weight to be accorded a treating physician's opinion.[6]  The regulations require the ALJ to give controlling weight to the opinions of "treating sources" when those opinions are well-supported by medical evidence and "not inconsistent with the other substantial evidence" in the record.  20 C.F.R. § 404.1527(c)(2).  When the ALJ does not give a treating physician's opinion controlling weight, the ALJ must consider the following factors in determining the weight to be given the opinion:  (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the evidence that supports the treating physician's report; (4) how consistent the treating physician's opinion is with the record as a whole; (5) the specialization of the physician in contrast to the condition being treated; and (6) any other factors which may be significant.  20 C.F.R. § 404.1527(c)(2); *see also, e.g.*, *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004).

## III.  DISCUSSION

In her complaint, Ms. Burch raises three key challenges to the ALJ's findings:  (1) that the findings were not supported by substantial evidence; (2) that the ALJ failed to give proper weight to Ms. Burch's treating physician; and (3) that the ALJ "wrongfully disregarded [Ms. Burch's] credible testimony regarding her serious and debilitating bowel problems, and her inability to function in any meaningful way in a regular work environment."  ECF No. 1, Compl. at 5-7.  In her opposition to the Commissioner's motion for judgment on the pleadings, Ms. Burch also asserts that the ALJ was

---

[6] The Commissioner has eliminated the treating physician rule for claims filed on or after March 27, 2017.  82 Fed. Reg. 5852-53 (Jan. 18, 2017).  Because Ms. Burch filed her claim in 2011, the rule still applies to her claim.

biased against her.  Pl.'s Mem. at 3-4, 5, 16-17.

Because there is no dispute with respect to Ms. Burch's DLI, and the ALJ found in Ms. Burch's favor on steps one and two, the court will proceed by assessing whether the ALJ's findings at the remaining steps of the sequential evaluation process were supported by substantial evidence in the administrative record.[7]  The Court will address Ms. Burch's more specific arguments regarding legal error at the appropriate points in the analysis.

### A.  Step Three

At step three, the ALJ determined that Ms. Burch did not have an impairment or combination of impairments that met or medically equaled one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "Medical Listings").  Tr. 16-17.  "For a claimant to show that his impairment matches a listing, it must meet *all* of the specified criteria.  An impairment that manifests only some of those criteria, no matter how severely, does not qualify."  *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990).  Even if a claimant's impairment does not meet the specific criteria of a Medical Listing, however, it may still medically equal the listing.  An impairment is medically equal to an impairment in the Medical Listings if it is "at least equal in severity and duration to the criteria of any listed impairment."  20 C.F.R. § 404-1526(a).  "The Commissioner will find that a claimant's impairment is medically equivalent to a Medical Listing if:  (1) the claimant has other

---

[7] Ms. Burch does not expressly challenge the ALJ's finding at step two.  However, the Court notes that, even if the ALJ had erroneously found some of Ms. Burch's conditions to be non-severe, it would be harmless error, since the ALJ considered all of Ms. Burch's impairments (both severe and non-severe) in the remainder of the sequential evaluation process.  *See, e.g., Snyder v. Colvin*, No. 13-cv-585 (GLS), 2014 WL 3107962, at *5 (N.D.N.Y. July 8, 2014) ("[W]hen an [ALJ] identifies *some* severe impairments at Step 2, and then proceeds through sequential evaluation on the basis of combined effects of all impairments, including those erroneously found to be non severe, an error in failing to identify *all* severe impairments at Step 2 is harmless." (emphasis in original)); *McCartney v. Comm'r of Soc. Sec.*, No. 07-cv-1572, 2009 WL 1323578, at *16 (W.D. Pa. May 8, 2009) ("Even if .the Court was to find that the ALJ did err in excluding headaches from the list of severe impairments, any such error was harmless because the ALJ found other severe impairments at step two and proceeded through the sequential evaluation on the basis of Plaintiff's severe and non-severe impairments."); *see also Stanton v. Astrue*, 370 F. App'x 231, 233 n.1 (2d Cir. 2010) ("Even if we were to reach of the merits of [claimant's] argument, we would not identify error warranting remand because the ALJ did identify severe impairments at step two, so that [claimant's] claim proceeded through the sequential evaluation.  Further, contrary to [claimant's] argument, the ALJ's decision makes clear that he considered the 'combination of impairments' and the combined effect of 'all symptoms' in making his determination.").

findings that are related to his or her impairment that are equal in medical severity; (2) the claimant

has a 'closely analogous' impairment that is 'of equal medical significance to those of a listed

impairment;' or (3) the claimant has a combination of impairments that are medically equivalent.

*Valet v. Astrue*, No. 10-cv-3282 (KAM), 2012 WL 194970, at *13 (E.D.N.Y. Jan. 23, 2012) (citing 20

C.F.R. § 404.1526(b)(1)-(3).  "For a claimant to qualify for benefits by showing that his unlisted

impairment, or combination of impairments, is 'equivalent' to a listed impairment, he must present

medical findings equal in severity to all the criteria for the one most similar listed impairment."

*Sullivan*, 493 U.S. at 531.

Here, the ALJ found, based on substantial evidence and correct legal principles, that Ms.

Burch's impairments did not meet or equal a listed impairment during the Relevant Period.  First,

the ALJ considered whether Ms. Burch's musculoskeletal impairments met or medically equaled

Listing 1.04.  To satisfy Listing 1.04, a claimant must establish the existence of a disorder of the

spine, such as herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis,

degenerative disc disease, facet arthritis, or vertebral fracture "resulting in a compromise of a nerve

root (including the cauda equine) or the spinal cord" with:

> A.  Evidence of nerve root compression characterized by neuro-anatomic
>     distribution of pain, limitation of motion of the spine, motor loss (atrophy
>     with associated muscle weakness or muscle weakness) accompanied by
>     sensory or reflex loss and, if there is involvement of the lower back, positive
>     straight-leg raising test (sitting and supine);
>
> or
>
> B.  Spinal arachnoiditis, confirmed by an operative note or pathology report of
>     tissue biopsy, or by appropriate medically acceptable imaging, manifested by
>     severe burning or painful dysesthesia, resulting in the need for changes in
>     position or posture more than once every 2 hours;
>
> or
>
> C.  Lumbar spinal stenosis resulting in pseudoclaudication, established by
>     findings on appropriate medically acceptable imaging, manifested by chronic
>     nonradicular pain and weakness, and resulting in inability to ambulate

effectively, as defined in 1.00B2b.

Pt. 404, Subpt. P, App. 1, Listing 1.04.

The ALJ considered the relevant medical evidence in the record, including records of an evaluation and treatment that Ms. Burch received from a chiropractor in December 2011, reports of Ms. Burch's March 2012 spinal MRIs, and reports of her May 2012 spinal x-rays. Tr. 17. Based on this evidence, the ALJ found that, during the Relevant Period, Ms. Burch's "musculoskeletal impairments were not attendant with the degree of severity outlined in Section 1.04, absent evidence of nerve root compression or spinal stenosis resulting in the inability to ambulate effectively." Tr. 17. As the ALJ explained in his decision, the evidence in the record shows that Ms. Burch had disc degeneration, disc space narrowing, mild facet arthropathy, and bone spurs. However, there is no evidence in the record of nerve compression, arachnoiditis, or stenosis; in fact, Ms. Burch's MRIs ruled out nerve compression and lumbar spinal stenosis, as reflected in her radiology reports. Tr. 651-53. Also absent from the record is evidence that Ms. Burch's musculoskeletal impairment otherwise resulted in motor loss, sensory or reflex loss, a need to change position or posture more than once every two hours, or an inability to ambulate effectively. Therefore, the ALJ's finding that Ms. Burch's impairments did not meet or medically equal Listing 1.04 is supported by substantial evidence.

With respect to Ms. Burch's digestive impairments, the ALJ found that they did not meet or medically equal Listing 5.06. To meet Listing 5.06(A), a claimant must show

> inflammatory bowel disease (IBD) documented by endoscopy, biopsy, appropriate medically acceptable imaging, or operative findings with . . . [o]bstruction of stenotic areas (not adhesions) in the small intestine or colon with proximal dilatation, confirmed by appropriate medically acceptable imagining or in surgery, requiring hospitalization for intestinal decompression or for surgery, and occurring on at least two occasions at least 60 days apart within a consecutive 6-month period.

Pt. 404, Subpt. P, App. 1, Listing 5.06(A). Ms. Burch argues in her complaint that "[t]here is no

question that [she] meets listing 5.06 based on the evidence taken as a whole." Compl. at 7. Prior to the hearing before the ALJ, Ms. Burch's attorney submitted a brief purporting to list the evidence in the record that shows that her impairment met the criteria in Listing 5.06(A). Tr. 321. He also made that argument at the hearing. Tr. 33. The Court has reviewed the record, focusing in particular on the evidence cited in Mr. Bromberg's brief to the ALJ and finds that, although it shows that Ms. Burch was "seen on an emergency basis" for bowel-related conditions on at least two occasions, 60 days apart within a consecutive six-month period, neither the evidence identified by Mr. Bromberg nor any other evidence in the record shows that she was hospitalized on any of those occasions, or that she received or needed intestinal decompression or surgery as a result of obstruction of stenotic areas.

With respect to the severity of Ms. Burch's digestive impairment more generally, the ALJ correctly noted that the record reflected a normal CT scan of the abdomen performed on September 27, 2011 and an unremarkable small bowel series performed on October 12, 2011. Tr. 17, 328, 418. In addition, the ALJ considered treatment notes from December 13, 2011 showing that Ms. Burch reported an improvement in her symptoms and reduced bleeding, which she attributed to dietary changes and other recommendations by a nutritionist. Tr. 17, 582-83.

Ms. Burch takes issue with the fact that the ALJ "mistakenly referenced [her] other condition of *Irritable Bowel Syndrome* (IBS-diagnosed in 1996) throughout his denial, and never once mentioned her main disability illness of "Ulcerative Colitis," which is an autoimmune Inflammatory Bowel Disease (IBD-diagnosed September 2011)." Compl. at 5. Although it is true that the ALJ referenced IBS in his decision, it is clear that he properly applied Listing 5.06, which covers inflammatory bowel disease, and that he assessed her conditions as they were relevant to the proper time period (2011, not 1996). Tr. 17. In addition, Ms. Burch is incorrect in saying that the ALJ "never once mentioned" her ulcerative colitis. In determining whether Ms. Burch met Listing 5.06,

18

the ALJ noted that she had been diagnosed with ulcerative proctosigmoiditis, symptomatic and

gastroesophageal reflux disease.  Tr. 17.  He also noted that Ms. Burch was "assessed with ulcerative

colitis" in March 2012.  *Id.*[8]

In sum, the Court finds that the ALJ's determination that the manifestations of Ms. Burch's

digestive condition did not meet or medically equal Listing 5.06 is supported by substantial evidence.

### B.  Residual Functional Capacity

Before proceeding to step four, the ALJ found that Ms. Burch had the residual functional

capacity ("RFC") to perform "light work" as defined in 20 C.F.R. § 404.1567(b), with the additional

limitations that she could only occasionally climb ramps and stairs, balance, stoop, kneel, crouch,

and crawl; she could never climb ropes, ladders, and scaffolds; and she required regular access to a

restroom on the same floor as her workstation.  Tr. 17.  In making that finding, the ALJ properly

considered all of Ms. Burch's symptoms (including those stemming from her non-severe

impairments), objective medical evidence and other evidence, as well as opinion evidence.

The Social Security Act provides that "[a]n individual's statement as to pain or other

symptoms shall not alone be conclusive evidence of disability."  42 U.S.C. §423(d)(5)(A).  Instead,

the ALJ must employ a two-step process to consider the extent to which subjective evidence of

symptoms can reasonably be accepted as consistent with the medical and other objective evidence.

*Id.*  First, the ALJ must consider whether the medical evidence shows any impairment "which could

reasonably be expected to produce the pain or other symptoms alleged."  *Id.*  Second, if an

impairment is shown, the ALJ must evaluate the "intensity, persistence, or functionally limiting

---

[8] The Court observes that, on September 21, 2011, Dr. Farrer found that Ms. Burch had proctocolitis in the rectum to 20 cm and a few sigmoid diverticuli.  Tr. 460-61.  She noted that there was "evidence of friability, loss of normal vascular pattern, small ulcerations consistent with ulcerative colitis."  Tr. 461.  In an October 11, 2011 letter to referring physician Dr. Michael Chartrand, Dr. Farrer wrote that Ms. Burch "underwent colonoscopy on September 21, 2011 which showed changes consistent with ulcerative colitis in the rectum to 20 cm.  These were confirmed on biopsy."  Tr. 457.  To the extent that there were indications that Ms. Burch had ulcerative colitis prior to the March 2012 date cited by the ALJ, the Court finds that it does not change the analysis.  Regardless of when that condition began, there is no evidence in the record to support a finding that Ms. Burch met or equaled the specific criteria in Listing 5.06.

effects" of a claimant's symptoms to evaluate the extent to which they limit the claimant's capacity

to work.  20 C.F.R. § 404.1529(b).  If the objective medical evidence alone does not substantiate the

claimant's statements about the intensity, persistence, or functionally limiting effects of her

symptoms, the ALJ must assess the credibility of the claimant's statements based upon consideration

of the case record as a whole.  20 C.F.R. § 404.1529(c)(4).

### 1.  Credibility Determination Concerning Ms. Burch's Symptoms

Here, the ALJ properly applied the two-step process.  Although he found Ms. Burch's

medically determinable impairments could reasonably be expected to cause her alleged symptoms,

Tr. 18-19, he found her statements concerning the intensity, persistence, and limiting effects of

those symptoms were "not entirely credible" and were "seemingly exaggerated and far exceed what

the relevant medical evidence of record . . . could reasonably expect to produce."  Tr. 19.  The ALJ

noted that Ms. Burch's reports of a very restrictive lifestyle and activities were "somewhat

inconsistent."  Tr. 19.  For example, she testified that she used a stationary bicycle and walked for 30

minutes per day only before her amended alleged onset date of September 25, 2011.  *Id.*; Tr. 61-63.

However, Ms. Burch reported this activity in a November 2011 function report, *id.*; Tr. 273, and

treatment notes from November 21, 2011 state:  "She rides a stationary bicycle three days a week for

an hour and walks seven days a week for 30 minutes.  She enjoys her exercise."  *Id.*; Tr. 595.

Treatments notes from December 2011 and January 2012 reflect the same report concerning her

physical activity.  Tr. 556.  Additionally, despite her claims of staying home, she reported to medical

providers that she went to museums and health food establishments, listened to music, and

meditated.  Tr. 558, 598.  The ALJ also noted that her complaints about her ability to concentrate

were at odds with her ability to complete online schoolwork during the period in question, and that

intake counseling records from March 2012 show that Ms. Burch reported no recent memory

changes and that she was pursuing a law degree online and loving it.  In addition, at a follow-up visit

on March 22, 2012, Ms. Burch's attention and concentration were described as "focused."  Tr. 493.

Evidence in the record also shows that Ms. Burch's ulcerative colitis symptoms improved shortly

before her DLI.  On December 13, 2011, she reported to one of her providers that her symptoms

and bleeding had gradually decreased approximately one month earlier due to dietary changes she

had made.  Tr. 582 ("She reports that it was a couple of months ago she was having significant

bleeding from ulcerative colitis; that bleeding has pretty much been reduced.").

As noted, "[i]t is the function of the [Commissioner], not [the reviewing court], to resolve

evidentiary conflicts and to appraise the credibility of witnesses, including the claimant."  *Carroll v.

Sec'y of Health & Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983) (citations omitted).  Thus, the ALJ,

"after weighing objective medical evidence, the claimant' demeanor, and other indicia of credibility

. . . may decide to discredit the claimant's subjective estimation of the degree of impairment."

*Tejada*, 167 F.3d at 776.  The ALJ is specifically permitted to consider "whether there are any

inconsistencies in the evidence and the extent to which there are any conflicts between your

statements and the rest of the evidence."  20 C.F.R. § 404.1529(c)(4).  An ALJ's finding that a

witness is not credible must "be set forth with sufficient specificity to permit intelligible plenary

review of the record."  *Williams o/b/o Williams v. Bowen*, 859 F.2d 255, 260-61 (2d Cir. 1988) (citing

*Carroll*, 705 F.2d at 643).

Here, the ALJ properly performed his function as factfinder.  There was evidence in the

record from which he could have determined that Ms. Burch's subjective reports about her

symptoms were not entirely credible or were exaggerated, and the ALJ described his reasoning with

sufficient particularity.  Accordingly, regardless of how the Court would weigh the conflicting

evidence were it in the ALJ's shoes, the Court must defer to the ALJ's credibility determination.

### 2.  Opinion Evidence

To assess Ms. Burch's RFC, the ALJ also relied on the opinions of the State agency medical

consultants who had reviewed the record both at the initial and reconsideration levels.  Tr. 20.  Dr. Kenneth Glass reviewed the record and assessed Ms. Burch's RFC at the initial consideration level on December 20, 2011.  Tr. 115-117.  Dr. Lawrence Schaffzin reviewed the record at the reconsideration level and affirmed the RFC on December 6, 2012.  Tr. 138.

Dr. Glass reviewed Ms. Burch's MRIs and records dated even prior to her amended alleged onset date.  Tr. 117.  He considered that Ms. Burch had a history of thelassemia minor, endometriosis, scoliosis, fatigue, ulcerative colitis, and irritable bowel syndrome.  Tr. 117.  He also considered the medical evidence, including MRIs from 2005 showing degenerative facet disease, her January and September 2011 colonoscopies, and EGD tests.  *Id.*:  Tr. 331-34, 462-63, 659-60.  Dr. Glass noted that Ms. Burch had complained in December 2011 of abdominal pain, fatigue, and heavy periods, likely from an ulcerative colitis flare.  Tr. 117; Tr. 578.  He also considered Ms. Burch's daily activities.  Tr. 117.  Dr. Glass arrived at an RFC that reflected limitations based upon Ms. Burch's degenerative disc disease, ulcerative colitis, left knee pain, and chronic fatigue.  *Id.*  He also noted that, although Ms. Burch "has a [history] of other numerous impairments, none of which cause any functional limitations at this time."  *Id.*

In December 2012, Dr. Schaffzin reviewed the record on reconsideration and found that, although Ms. Burch had alleged a worsening of her condition, the medical evidence did not support any significant increase in severity.  Tr. 138.  Thus, Dr. Schaffzin affirmed the December 2011 RFC finding.  *Id.*

Because State agency medical examiners are "highly qualified and experts in Social Security disability evaluation," ALJs must consider their findings, though they are not required to adopt them.  20 C.F.R. § 404.1513a(b); Social Security Ruling 96-6p, 1996 WL 374180 (July 2, 1996).  "[I]t is well settled that an ALJ is entitled to rely upon opinions of both examining and non-examining State agency medical consultants, since such consultants are deemed qualified experts in the field of

social security disability." *Coburn v. Astrue*, No. 07-cv-0029 (VEB), 2009 WL 4034810, at *11

(N.D.N.Y. Nov. 19, 2009); *see also Mongeur v. Heckler*, 722 F.2d 1033, 1039 (2d Cir. 1983) (stating that

the report of a consultative physician may constitute substantial evidence); *Leach ex rel. Murray v.*

*Barnhart*, No. 02-cv-3561, at *9 (S.D.N.Y. Jan. 22, 2004) ("State agency physicians are qualified as

experts in the evaluation of medical issues in disability claims.  As such their opinions may constitute

substantial evidence if they are consistent with the record as a whole.")

     The ALJ reviewed the opinions of Drs. Glass and Schaffzin regarding Ms. Burch's RFC and

found that, "[a]lthough these assessments are from non-treating, non-examining physicians, they are

nevertheless well supported by the diagnostic studies/x-rays of claimant's spines showing no

significant stenosis."  Tr. 20.  Accordingly, the ALJ's reliance on the opinions of the State agency

medical consultants was legally proper and supported by substantial evidence.

### 3.  Application of the Treating Physician Rule

     Ms. Burch argues that the ALJ failed to give proper weight to the opinion of her treating

physician, Dr. Jessica Korman.  Compl. at 2.  Dr. Korman began seeing Ms. Burch monthly on April

11, 2013, nearly 16 months after Ms. Burch's DLI.  *See* Tr. 750.  On July 5, 2013, Dr. Korman

submitted to the SSA a "medical source statement," in which she opined that, in addition to

treatment of active colitis with prednisone (which caused some side effects), Ms. Burch suffered

from depression, anxiety, and PTSD that affected her physical condition.  Tr. 751.  Dr Korman

opined that, as a result of her impairments, Ms. Burch was limited to walking four city blocks, was

limited to sitting and standing/walking less than two hours total in an eight-hour work day, and

needed a job that permitted shifting positions at will and ready access to a restroom.  *Id.*  She also

opined that Ms. Burch would need unscheduled restroom breaks six times during the workday for

15 minutes each time with no meaningful notice.  Tr. 751-52.  She further opined that Ms. Burch

would need to lie down or rest at unpredictable intervals more than eight times per day for 10-15

minutes each time.  Tr. 752.  Dr. Korman limited Ms. Burch to lifting and carrying less than ten

pounds occasionally, restricted all climbing of ladders, and limited her to stooping and climbing

stairs only rarely.  *Id.*  According to Dr. Korman's medical source statement, Ms. Burch was likely to

be "off task" 25% or more of the typical workday and was incapable of even "low stress" work.  *Id.*

Finally, Dr. Korman, opined that, as a result of her impairments or treatment, Ms. Burch was likely

to be absent from work more than four days per month.  *Id.*

      The ALJ considered Dr. Korman's opinion and recognized her as a treating source.  Tr. 20.

However, he accorded her opinion no weight as it related to Ms. Burch's limitations during the

Relevant Period, though he did incorporate into the RFC Dr. Korman's recommendation that Ms.

Burch have regular access to a restroom.  *Id.*  Because Dr. Korman did not begin treating Ms. Burch

until more than 15 months after her DLI, the ALJ found Dr. Korman's opinion and her treating

relationship "too remote to be relevant."  *Id.*  The ALJ's decision to accord no weight to Dr.

Korman's opinion was proper.  The ALJ was not required to consider Dr. Korman a "treating

source" within the meaning of the rule.  As the Second Circuit explained in *Arnone*, "[t]he opinion of

a treating physician is accorded extra weight because the continuity of treatment he provides and the

doctor/patient relationship he develops place him in a unique position to make a complete and

accurate diagnosis of his patient."  882 F.2d at 41.  The uniqueness of that physician's position falls

away when there is "no ongoing physician-treatment relationship" during the relevant period.  *Id.*  In

addition, when an opinion does not relate to the relevant period, the ALJ is entitled to deem it

irrelevant.  *See, e.g., Papp v. Comm'r of Soc. Sec.*, No. 05-cv-5695, 2006 WL 1000397, at *15 (S.D.N.Y.)

(magistrate judge) ("The reports that [the doctor] prepared on July 15, 2002 and June 25, 2003

describe [claimant's] symptoms as of those dates, which are well after [the claimant's] June 30, 2001

last insured date, and therefore they are irrelevant to this analysis."); *Dailey v. Barnhart*, 277 F. Supp.

2d 226, 233 n.14 (W.D.N.Y. 2003) ("Medical opinions given after the date that [the claimant's]

insured status expired are taken into consideration *if such opinions are relevant to her condition prior to that date*." (emphasis added)); *cf. also Acosta v. Barnhart*, No. 99-cv-1355, 2003 WL 1877228, at \*12-13 (S.D.N.Y. Apr. 10, 2003) (magistrate judge) (holding that, although medical reports from June 1998 definitively showed that claimant was disabled, those reports did not show that claimant was disabled prior to his DLI of December 31, 1995).

Because Dr. Korman did not begin seeing Ms. Burch until April 2013, more than 15 months after her DLI, and her July 2013 opinion did not purport to relate back to any earlier period, the ALJ could properly find that her opinion was not relevant to Ms. Burch's disability status during the Relevant Period and accord it no weight. Therefore, the Court finds no legal error in the ALJ's decision to do so. In addition, the Court observes that the ALJ properly noted in his decision that no treating or examining physician provided an opinion that Ms. Burch was disabled during the Relevant Period.

\* \* \*

The ALJ properly found that the opinions of the State agency medical consultant with respect to Ms. Burch's RFC were consistent with medical evidence in the record, and the Court finds that the consultants' opinions were themselves supported by substantial evidence. Additionally, the ALJ did not err in affording Dr. Korman's opinion no weight due to the remoteness of her treating relationship and opinion in relation to the Relevant Period. As a result, the Court finds that the ALJ's finding with respect to Ms. Burch's RFC is free of legal error and supported by substantial evidence.

### C. Step Four

A claimant will be found disabled at step four if she shows that her RFC rendered her unable to perform her past relevant work during the Relevant Period. More specifically, the burden at step four was on Ms. Burch to show both that she was unable to perform her previous specific jobs *and*

that she was unable to perform her past relevant work as it is performed generally in the national economy. *Jasinski v. Barnhart*, 341 F.3d 182, 185 (2d Cir. 2003). "Past relevant work" is work that a claimant has done within the past 15 years, that was substantial gainful activity, and that lasted long enough for her to learn to do it. 20 C.F.R. § 404.1560(b)(1). There is no dispute that Ms. Burch's jobs at Southwest Reef Company and the investment bank constitute "past relevant work."

The vocational expert, Dr. Ryan, testified that Ms. Burch's past relevant work at Southwest Reef Company, where she had cashier and stocking duties, was semi-skilled at the light exertional level under the DOT. Tr. 67. He also testified that Ms. Burch's job in the bank's compliance department was sedentary and skilled under the DOT. Tr. 67-68. The ALJ then asked Dr. Ryan to assume a hypothetical that incorporated Ms. Burch's age, education, work history, and a complete recitation of the RFC, including the additional limitation that the individual needed regular access to a restroom on the same floor as the work station. Tr. 68. Dr. Ryan testified that the person described in the hypothetical would be able to perform all of Ms. Burch's past relevant work.

The ALJ found that Ms. Burch was able to perform her past relevant work as it was generally performed. In reaching that finding, the ALJ relied on Dr. Ryan's testimony, which he found credible. "An ALJ may rely on a vocational expert's testimony regarding a hypothetical as long as there is substantial record evidence to support the assumption[s] upon which the vocational expert based his opinion, and accurately reflect the limitations and capabilities of the claimant involved." *McIntyre v. Colvin*, 758 F.3d 146, 151 (2d Cir. 2014) (internal quotation marks and citations omitted). The hypothetical that the ALJ presented to Dr. Ryan precisely tracked the RFC assessment made at the previous step of the determination, which the Court has already held was supported by substantial evidence in the record. Accordingly, the ALJ was entitled to rely on Dr. Ryan's testimony at step four.

In her opposition brief, Ms. Burch argues in considerable detail that she was unable to

handle the physical aspects of her job as she performed it at Southwest Reef Company.  Pl.'s Mem. at 2-3.  Even assuming that is true, her argument is unavailing, because a claimant will be found not disabled at step four if she is able to perform either her past specific job *or* her past relevant work as generally performed in the national economy.  Dr. Ryan testified that Ms. Burch could perform her past relevant cashier and stocking work as it is generally performed, separate and apart from the particularities of the job she held at Southwest Reef Company, and the ALJ properly relied on that opinion.  Therefore, even if Ms. Burch was unable to continue her work at her brother's store, the ALJ's determination that she could perform her past relevant work as generally performed was supported by substantial evidence.

### D.  Step Five

Having found Ms. Burch not disabled at step four, the ALJ could have stopped his decision there.  Instead, he made an alternative finding that there were other jobs that existed in significant numbers in the national economy that Ms. Burch could have performed, given her age, education, work experience, and RFC.  Tr. 21-22.  Because Ms. Burch's RFC included significant non-exertional limitations, the ALJ was unable to rely on the Medical-Vocational Guidelines (*i.e.*, the Grids).  *See Bapp v. Bowen*, 802 F.2d 601, 605 (2d Cir. 1986).  Instead, as at step four, the ALJ relied on Dr. Ryan's testimony.  Dr. Ryan testified that there were jobs that existed in significant numbers in the national economy, both with the added limitation of no more than occasional contact with the general public and co-workers, and even when the RFC was reduced to the sedentary level.  Tr. 68-70.  Finding that Dr. Ryan's testimony was consistent with the information contained in the DOT, the ALJ properly adopted Dr. Ryan's testimony.

Dr. Ryan also testified that, with the limitations set out in Dr. Korman's medical source statement—namely, the need to take seven or eight breaks during the day, each of five to ten minutes in duration—the hypothetical person would be unemployable.  Tr. 72.  However, having properly

found that Dr. Korman's opinion was entitled to no weight due to the remoteness of her treating relationship and her opinion in relation to the Relevant Period, the ALJ was entitled not to adopt that portion of Dr. Ryan's testimony. As with each of the previous steps of the sequential evaluation process, the Court finds that the ALJ's finding with respect to step five was supported by substantial evidence.

### E. Ms. Burch's Claim of Bias, Character Attacks, and Failure to Call her Husband to Testify

Ms. Burch appears to argue that the ALJ acted improperly at the hearing, alleging that he "bullied" and "brow beat" her during the hearing, that he did not permit her to testify from a copy of her attorney's pre-hearing brief, that he tried to "falsely invalidate and dilute the validity" of her testimony, and that he did not permit her husband to testify for the purpose of "verify[ing her] statements." Pl.'s Mem. at 3-6, 16-17. The Court has reviewed the record and finds no evidence that the ALJ acted improperly or displayed bias.

First, to the extent that Ms. Burch contends that the ALJ was biased simply because he works for the SSA, *see* Pl.'s Mem. at 3-4, that structural argument has been rejected by the Supreme Court. *See Richardson v. Perales*, 402 U.S. 389, 410 (1971) ("Neither are we persuaded by the advocate-judge-multiple-hat suggestion. It assumes too much and would bring down too many procedures designed, and working well, for a governmental structure of great and growing complexity. The social security hearing examiner, furthermore, does not act as counsel. He acts as an examiner charged with developing the facts. The 44.2% reversal rate for all federal disability hearings in cases where the state agency does not grant benefits attests to the fairness of the system and refutes the implication of impropriety." (internal citation omitted)). Where bias on the part of an agency ALJ is alleged, the reviewing court "must start . . . from the presumption that the hearing officers . . . are unbiased." *Schweiker v. McClure*, 456 U.S. 188, 195-96 (1982). That presumption can be overcome only if the plaintiff shows that the ALJ had a "conflict of interest or some other specific reason for

disqualification."  *Id.* at 195.

The record in this case does not reveal any bias, conflict of interest, or other disqualifying interest on the part of the ALJ.  To the contrary, the record shows that the ALJ provided Ms. Burch with a fair hearing.  Ms. Burch has not identified any specific instances of the ALJ "bullying" or "brow beating" her, and the Court is unable to find any in the record.  Moreover, Ms. Burch was represented by an attorney at her hearing, and the ALJ permitted the attorney to question Ms. Burch and present evidence, Tr.  34-75, to object to admission of the exhibits into evidence, Tr. 32, to object to the testimony of Dr. Ryan, Tr. 67, and to ask Dr. Ryan questions, Tr. 72.  The ALJ also explained the nature of the proceedings and described the issues in the case to Ms. Burch, Tr. 35-36, and he posed relevant questions concerning Ms. Burch's medical care, work history, medications, and activities, Tr. 39-67.

With respect to Ms. Burch's complaint that the ALJ did not permit her to testify from her attorney's pre-hearing brief, the ALJ properly instructed her to testify to the extent that she could from her recollection.  Tr. 51.  When she could not recall the answers to certain questions, such as the exact dates on which she attended school, the ALJ requested that her attorney obtain and submit Ms. Burch's educational records, which her attorney agreed to do on the record.  Tr. 43-44, 73.  There was nothing unfair about the ALJ's conduct of the hearing in this regard.

Ms. Burch also accuses the ALJ of not permitting her husband to testify for the purpose of "verify[ing her] statements."  Pl.'s Mem. at 17.  While her attorney did proffer her husband at the hearing to certify Ms. Burch's symptoms, the ALJ advised him that he could instead submit her husband's statement in written form, to which her attorney replied "Okay.  Thank you, your honor." Tr. 66-67.  Because the record does not show that Mr. Bromberg objected, and he in fact agreed to submit a written statement, Ms. Burch's argument that the ALJ treated her unfairly by refusing to afford her husband an opportunity to testify at the hearing is unpersuasive.

**F.  Evidence Postdating Ms. Burch's DLI and Additional Evidence Submitted to the Appeals Council**

As the Commissioner correctly states, evidence that an impairment reached disabling severity only after a claimant's DLI cannot be the basis for a determination of entitlement to disability insurance benefits, even if the impairment may have existed before the claimant's DLI and subsequently worsened.  Instead, a claimant is entitled to benefits only if she establishes that her condition or conditions reached disabling severity on or before the expiration of her insured status. *Arnone v. Bowen*, 882 F.2d 34, 37-38 (2d Cir. 1989) (citing 42 U.S.C. § 423(a)(1)(A)); *see also* 20 C.F.R. § 404.130; 20 C.F.R. § 404.131; 20 C.F.R. 404.315(a); 20 C.F.R. § 404.320(b).  Accordingly, Ms. Burch's references to medical evidence post-dating her December 31, 2011, is only relevant to the extent to it bears upon her condition during the Relevant Period.  Thus, the ALJ could properly have deemed evidence referring to Hashimoto's thyroiditis *suspected* but not established as of February 2012, after she underwent thyroid tests in January 2012, not relevant, particularly since the February 2012 medical records show that "[h]er thyroid function test looks completely normal."  Tr. 524.

When Ms. Burch requested review by the Appeals Council, she submitted additional medical records, including records of an appendix surgery in 2015, as well as other records from 2012 and 2014.  Tr. 2.  The Appeals Council ruled that this additional evidence did not affect the decision about whether Ms. Burch was disabled during the Relevant Period, because it was "about a later time."  *Id.*  The Appeals Council did not err in making that determination.  By regulation, the Appeals Council will only consider additional evidence submitted in connection with a request for review of the ALJ's decision if the evidence is "new, material, and relates to the period on or before the date of the hearing decision," and if the claimant shows "good cause" for not submitting the evidence to the ALJ.  20 C.F.R. § 404.970(a).  New evidence is "material" if it is "both (1) relevant to the claimant's condition during the time period for which benefits were denied and (2) probative."

*Pollard v. Halter*, 377 F.3d 183, 193 (2d Cir. 2004).  The Appeals Council did not err in finding that the post-DLI and post-decision reports did not relate back to the Relevant Period and were therefore immaterial to review of Ms. Burch's claim.

## IV.    CONCLUSION

The Court is sympathetic to Ms. Burch's medical conditions and the difficulties attendant to them.  However, a claimant is not entitled to disability insurance benefits under the Act solely because of illness.  Instead, a claimant must establish that, during the relevant period between her alleged onset date and her DLI, her illness precluded her from performing both her past relevant work and any other work that is available in significant numbers in the national economy.  Because the ALJ's finding that Ms. Burch was not limited to that degree was free of legal error and supported by substantial evidence in the record, the Court must affirm that finding.  Accordingly, the Commissioner's motion for judgment on the pleadings is GRANTED.

The Clerk of Court is directed to terminate the motion pending at Dkt. No. 19, enter judgment in favor of Defendant, and to close this case.

The Clerk of Court is further instructed to send a copy of this order, the judgment, and notice of the right to appeal to Plaintiff by certified mail.


SO ORDERED.

Dated:  March 28, 2017
        New York, New York

_____
GREGORY H. WOODS
United States District Judge